UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EMC CORPORATION, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) Civil Action No. _____ <br> ) |
| CHADWICK JOHNSON, | ) <br> ) <br> ) |
| Defendant. | ) <br> ) |

## VERIFIED COMPLAINT

Plaintiff EMC Corporation ("EMC") files this Verified Complaint for declaratory and preliminary and permanent injunctive relief and alleges as follows:

## NATURE OF THE ACTION

1.  This is an action based on the wrongful conduct of Chadwick Johnson ("Johnson"), who was a highly-compensated EMC sales representative previously responsible for selling EMC products and services to key strategic customers. The action is part of a larger drama unfolding between EMC and various of its former employees, each of whom have resigned from EMC to join direct competitor Pure Storage, Inc. ("Pure Storage"), and each of whom have wrongfully taken confidential and competitively sensitive EMC materials with them upon joining Pure Storage. Most recently, EMC filed suit in this Court against Johnson's Texas-based former EMC colleague, Ricky Cochran, after Cochran was found to have violated his obligations to EMC by, among other things, misappropriating sensitive EMC materials upon accepting employment with Pure Storage. This matter is filed as a related action to *EMC Corporation v. Ricky Cochran*, 1:13-cv-12380-PBS.

2. Johnson is a party to a Key Employee Agreement ("KEA") with EMC. Pursuant to his KEA, Johnson has ongoing contractual obligations to EMC, including (a) not to use, divulge or disclose to persons outside of EMC its confidential and proprietary business information not available to the public concerning EMC and its customers ("Confidential Information"), and (b) to return all Company materials as described in the KEA, (collectively with Confidential Information, "EMC Property") in his possession, custody or control upon leaving EMC. This action seeks to require Johnson to honor his obligations to EMC and to refrain from unlawfully possessing or using EMC Property on behalf of Johnson's new employer, Pure Storage. Pure Storage is a direct competitor of EMC in the enterprise storage market.

3. EMC learned recently that Johnson has violated his KEA with EMC by failing to return highly confidential, competitively sensitive EMC Property in his possession, custody, or control upon leaving EMC and, on information and belief, by using EMC Property on behalf of his new employer, Pure Storage.

4. This action seeks to enjoin Johnson's unlawful conduct in order to protect EMC's legitimate business interests, including its Confidential Information and goodwill in the marketplace, and to prevent EMC from suffering additional, irreparable harm.

5. In limited instances where indicated, allegations in this Verified Complaint are based upon information and belief. Such allegations stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.[1]

---

[1] The allegations of this Verified Complaint have been verified by Thomas Siegel, except for Paragraph Nos. 30-41, which are supported by the Declaration of Kevin Brisson ("Brisson Decl."), filed herewith.

## PARTIES

6. Plaintiff EMC is a Massachusetts corporation with its principal place of business in Hopkinton, Massachusetts, and other offices located in Boston, Massachusetts.

7. Upon information and belief, Defendant Johnson is a resident of Texas. Johnson is bound by his KEA, which is expressly governed by Massachusetts law, and in which he expressly consented to personal jurisdiction in Massachusetts. Ex. A, ¶ 7(h).

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between EMC and Johnson, and the amount presently in controversy exceeds $75,000, exclusive of interests and costs.

9. This Court has personal jurisdiction over Johnson because, among other reasons, (a) Johnson transacted business and contracted with his former employer, EMC, in Massachusetts on matters directly related to the current dispute; (b) his actions complained of herein are causing injury to EMC in Massachusetts; and/or (c) he expressly consented to personal jurisdiction in Massachusetts state and federal courts in his KEA. A, ¶ 7(h).

10. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events giving rise to the claims occurred in Massachusetts and defendant Johnson is subject to this Court's personal jurisdiction with respect to this civil action.

## FACTUAL BACKGROUND

### *EMC is in a Highly Competitive Industry*

11. EMC is one of the leading technology companies in the United States. EMC is engaged in, among other things, the business of designing, manufacturing and selling

technologies and information storage systems for managing information in complex technical environments.

12. EMC competes with many companies in the markets that it serves, and its products have achieved broad market acceptance due in large part to their technical superiority to competing offerings and the team of skilled sales professionals and technical consultants who effectively market and sell these products to EMC's customers. In order to maintain this competitive advantage, EMC expends substantial resources to safeguard and protect its Confidential Information.

13. One of the significant markets in which EMC competes is the enterprise storage market. Enterprise storage refers to the market for computer data storage designed for large-scale high-technology environments. EMC and Pure Storage – Johnson's current employer – are commercial rivals and compete directly in the enterprise storage market. Pure Storage's website has numerous references identifying EMC as Pure Storage's "primary competitor" in the enterprise storage marketplace, including numerous statements from Pure Storage's CEO describing EMC as a direct competitor. Indeed, in a recent article titled "Pure Storage Targets EMC, Streaks to IPO with $250 Million Capital Infusion," Pure Storage's CEO trumpeted what he characterized as Pure Storage's lower price per gigabyte of storage when compared to EMC, and acknowledged "[w]e tell the channels that they can sell to the EMC customers that it deals with [sic] via direct sales by selling Pure's product." Peter Cohan, FORBES, Aug. 29, 2013, http://www.forbes.com/sites/petercohan/2013/08/29/pure-storage-targets-emc-streaks-to-ipo-with-150-million-capital-infusion (quoting Pure Storage CEO Scott Dietzen).

14. EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its trade secrets and Confidential Information, including but not limited to, requiring

its employees to sign KEAs, requiring its customers, partners and vendors to sign non-disclosure agreements, password protecting its computer systems and employing physical security measures at all of its facilities. Moreover, EMC adopts and enforces several written policies that are designed to protect its Confidential Information and trade secrets, including following the concept of "need-to-know" or "least privilege," pursuant to which employees are only provided the minimum access to Confidential Information needed to perform their assigned duties.

### *Johnson's Key Employee Agreement with EMC*

15.     Johnson was employed by EMC (or its subsidiary VMWare) as a Partner Sales Manager from February 13, 2006 until September 18, 2013.  In his final four years at EMC alone, EMC paid Johnson more than $1.1 million.

16.     During his tenure with EMC, Johnson was responsible for selling to several of EMC's key strategic enterprise accounts.  As a Partner Sales Manager, Johnson was entrusted with competitively sensitive, confidential business information developed and used by EMC, including confidential business plans, customer and partner lists, marketing strategies, product development plans, product offerings, pricing structures, solicitation methods, sales strategies and other confidential and proprietary information that would be valuable to an EMC competitor such as Pure Storage. Johnson also acquired knowledge of ongoing and potential customer relationships and the key decision makers within those organizations, such as Chief Information Officers, Directors of Infrastructure and Purchasing Managers.  EMC devotes significant resources towards developing and maintaining the secrecy of this information because it is a primary reason for EMC's success and its goodwill in the marketplace.

17.     To protect EMC's body of patentable, trade secret, and Confidential Information, EMC requires employees such as Johnson to enter into KEAs at the commencement of their

employment with EMC. A true and accurate executed copy of Johnson's KEA with EMC is attached hereto as Exhibit A.

18. The KEA was entered into as (a) a condition of, and in consideration for, Johnson's employment with EMC, and (b) "[i]n view of the highly competitive nature of the business of [EMC], the need of [EMC] to maintain its competitive position through the protection of its goodwill, trade secrets and confidential and proprietary information, and in consideration for being provided with access to certain trade secrets and/or confidential and proprietary information in conjunction with [Johnson's] employment with [EMC]." Ex. A, pp. 1-2.

19. By executing his KEA with EMC, Johnson agreed, among other things, not to use, divulge or disclose to persons outside of EMC any Confidential Information, and to keep all non-public EMC materials and information confidential:

> **Confidentiality of Company Materials**. You agree that both during your employment with [EMC] and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within [EMC] whose positions require them to know it, any information not already lawfully available to the public concerning [EMC] ("Confidential Information"). Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business or products of [EMC]; any information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposals and the responses thereto.

Ex. A, ¶ 3.

20. By executing his KEA with EMC, Johnson also expressly acknowledged that information about EMC's customers, partners and vendors was confidential, and he agreed not to use or disclose it:

> **Customer, Partner, and Vendor Confidentiality**. You recognize that it is essential to [EMC's] success that all nonpublic customer, partner and vendor information is deemed to be confidential and be properly treated as a confidential trade secret. Therefore, you agree not to use or disclose any such customer, partner or vendor information except as may be necessary in the normal conduct of [EMC's] business for the specific customer, partner or vendor, and at the end of your employment with [EMC], you will return to [EMC] any materials containing such information.

Ex. A, ¶ 2.

21. Johnson further agreed that, upon termination from EMC, he would return to EMC all EMC Property:

> **Return of Company Materials**. At the time of your termination, for any reason, from [EMC], you agree to return immediately to [EMC] all [EMC] materials, which include but are not limited to all documents in any tangible or electronic form and all property, in your possession, custody or control relating to work done for [EMC] or relating to the processes and materials of [EMC], as well as all materials concerning past, present and future or potential EMC clients, customers, products and/or services. Such materials include, but are not limited to, customer and/or vendor lists, customer and/or vendor prospect material, financial projections, pricing or other sales-related data, rate structures, all technical materials, presentation materials, and software owned or developed by [EMC] for any purpose in any form. You also agree to return to [EMC] all materials provided by customers of [EMC] and all teaching materials provided by [EMC].

Ex. A ¶ 6.

22. By signing his KEA, Johnson agreed that (a) "the terms of [the KEA] are reasonable and properly required for the adequate protection of [EMC's] legitimate business interests," and (b) "any breach of [the KEA] will cause immediate and irreparable harm to

[EMC] not compensable by monetary damages and that [EMC] will be entitled to obtain injunctive relief . . . to enforce the terms of [the KEA], without having to prove or show any actual damage to [EMC]. Ex. A, ¶¶ 7(c) and (d).

23. EMC provided the KEA to Johnson for his review and execution along with a cover letter from EMC's President and Chief Executive Officer, Joseph M. Tucci, stating, among other things:

> In consideration of your employment by EMC and in recognition of the fact that as an employee of EMC you have access to confidential information, I ask that you please review and sign the following Key Employee Agreement (the "Agreement"). This Agreement protects the both the Company and its employees from unfair competition from former employees. This Agreement, when signed by you, is a binding legal agreement. You are advised to review its terms with your legal advisor before signing it.
>
> ***
>
> If you have any questions, either your supervisor or your human resources representative would be happy to discuss them with you. Please keep one copy of the Agreement for your records.

Ex. A, p. 1.

24. Johnson reviewed his KEA electronically and provided an electronic signature acknowledging, among other things:

- "I acknowledge and agree that I was given adequate time to review the attached documents and ask questions."

- "I understand that I was given the opportunity to review the terms of the KEA with a legal advisor before signing (affirming)."

- "I have read, understand and agree I am legally bound by EMC's KEA (including but not limited to the Arbitration provision)."

25. As a result of the cover letter from Mr. Tucci and the electronic acknowledgment form, Johnson was advised of (a) the legal significance of signing the KEA, (b) the opportunity

to consult with a lawyer regarding the terms of the KEA, and (c) the opportunity to consult an EMC supervisor or human resources representative about the terms of the KEA.

26. The KEA put Johnson on notice that (a) EMC could commence a court action against him in Massachusetts seeking injunctive and declaratory relief for violation of the KEA, (b) the appropriate venue for such action is "in the state and/or federal courts located in Massachusetts," and (c) the KEA "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law." Ex. A, ¶¶ 7(d), (h), and (j).

27. Johnson expressly agreed to "consent to personal jurisdiction in [the state and/or federal courts located in Massachusetts]." *Id.*, ¶ 7(h).

28. The cover letter from Mr. Tucci, as well as Johnson's written offer of employment, bears the address of EMC's headquarters located in Hopkinton, Massachusetts.

29. Johnson has personally visited Massachusetts for business purposes on at least a dozen occasions. For example, in November 2008 he spent approximately one week in Massachusetts attending an EMC training session called "New Hire Training – Mid Market," at which Johnson received extensive training regarding, among other things, EMC's products, services, and pricing and sales methodologies. Johnson also communicated on an almost-daily basis with Massachusetts-based EMC employees (including his supervisor, as well as marketing and finance employees, and sales employees at the "Pricing Desk") via email and telephone. Johnson was required to work with the Pricing Desk in order to close sales transactions with EMC customers. Johnson was also issued EMC stock.

***Johnson Failed to Return, and is Using, EMC Property in Violation of his KEA***

30.     Johnson's last day at EMC's Austin, Texas office was September 18, 2013. Through forensic analysis of Johnson's EMC-issued laptop ("Laptop"), EMC has learned recently that on September 17th and 18th, 2013 – during the final 48 hours of his EMC employment – Johnson surreptitiously accessed several EMC files on his Laptop from two separate external storage devices ("External Storage Devices") that he failed to return upon his termination from EMC.

31.     Among the files Johnson accessed on his EMC Laptop from the External Storage Devices on September 17 and 18, 2013 were:

- *Registration Report on 09.xlsx*: This EMC Registration Report contains in excess of 93,000 entries. The Registration Report contains information that EMC salespersons are required to document in the EMC system when they work with a new customer or new EMC partner. The Registration Report includes names, purchase histories, deal values, and other highly specific, confidential, and critical information about EMC customers. This document is EMC Confidential Information.

- *PurevsXtremIObattlecard_9_9_2013(3).pdf*: This EMC Competitive Selling Guide sets forth EMC's strategy for selling its XtremIO flash storage product against Pure Storage's FA Series products. The Selling Guide includes information regarding the competitive advantages of EMC's XtremIO product, as well as highly sensitive, detailed explanations of EMC's head-to-head selling strategy. This document is labeled "EMC CONFIDENTIAL."

- *Chad Johnson 2H 2013 Business Plan_template.pptx*: This EMC Business Plan contains detailed data regarding EMC customer, partner, and employee relationships, as well as highly sensitive analysis of the competitive landscape and EMC's "Key Strategies" for growth in the enterprise storage market. This document is labeled "EMC CONFIDENTIAL."

- *Fazende Q3 Channel Leverage Framework Review.pptx*. This document includes extensive data and analysis regarding EMC's strategy for leveraging customer and partner relationships. This document is labeled "EMC CONFIDENTIAL."

32.     In addition, on September 17, 2013, Johnson printed a file named *Fazende Q3-13 revenue Position 091713.xlsx*. This file is an Area Manager Report that includes detailed confidential and sensitive information regarding EMC customers, specific products sold to those

customers, revenue generated, progress against goals, sales forecasts, and responsible sales representatives. This document, too, is EMC Confidential Information. Johnson did not return this document upon his termination from EMC.

33. The above-described materials (collectively, the "Misappropriated Materials") constitute EMC Property and Confidential Information, and they are expressly subject to the restrictions set forth in Johnson's KEA. Ex. A, ¶ 2 (customer, partner, and vendor information is confidential); ¶ 3 (Confidential Information includes "any information concerning the particular needs of clients or customers and their buying patterns"); ¶ 6 ("all materials concerning past, present and future or potential EMC clients, customers, products and/or services" must be returned upon termination of employment). As explained above, Johnson agreed that (a) he would "not use for [his] own benefit, divulge or disclose to anyone except to persons within [EMC] whose positions require them to know it" the Misappropriated Materials, and (b) he would return the Misappropriated Materials upon termination of his employment. Ex. A, ¶ ¶ 3 and 6.

34. The information contained in the Misappropriated Materials is confidential, competitively sensitive, and owned by EMC. It has independent economic value by virtue of not being known to EMC's competitors, including Pure Storage, who could obtain substantial economic value from its disclosure or use, including by using the information to unfairly compete with EMC and poach EMC's customers. As explained above, EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of this and other Confidential Information. Johnson accessed the Misappropriated Files on his final two days at EMC, when he had no legitimate business reason for accessing the particular, highly confidential Misappropriated Files. Moreover, each of the Misappropriated Files resided on the two separate

External Storage Devices as of the date that Johnson accessed them on his Laptop. Because Johnson did not return these External Storage Devices upon his termination from EMC, EMC cannot identify the additional EMC files (and the amount thereof) that may reside on those devices.

35.     EMC confirmed that Johnson did not return the External Storage Devices containing the Misappropriated Materials to the same EMC employee to whom he returned his Laptop. EMC also conducted a search of Johnson's former office space at EMC but did not locate the External Storage Devices.

36.     On September 23, 2013, a member of the EMC Office of the General Counsel wrote to Mr. Johnson reminding him of his continuing legal obligations to EMC, including his obligation to maintain EMC's Confidential Information and to return to EMC all EMC documents, information and materials (the "Legal Letter").

37.     By letter dated October 8, 2013, Johnson responded to the Legal Letter by returning to EMC substantial volumes of material that Johnson had misappropriated and taken with him upon joining Pure Storage. Such material included eight separate external storage devices containing EMC materials, contact business cards, a wireless hotspot and a wireless receiver. Johnson claimed in the letter that he was returning "all company materials, information and documents" in his possession.

38.     Mr. Johnson did not reference the two External Storage Devices which EMC's forensic analysis confirms he connected to his EMC-issued laptop in the final 48 hours of his employment with the company, and he did not reference the highly sensitive EMC files that he accessed through that process.

39. Mr. Johnson did not return to EMC the two External Storage Devices that EMC's forensic analysis confirms he connected to his EMC-issued laptop in the 48 final hours of his employment with the company – notwithstanding his return of other EMC Property unlawfully in his possession.

40. In addition to the above, on February 8, 2013, while still employed by EMC, Johnson created a "Free Subscription" account using his EMC email account at Syncplicity.com, which is an internet-based service to store, synchronize, and share files among computers and mobile devices. Johnson configured this service to synchronize numerous folders containing hundreds of files between his EMC-owned laptop and Syncplicity's servers, including EMC confidential information.

41. Johnson's October 8, 2013, letter states that he "deleted [his] EMC Syncplicity backup account upon [his] departure," but EMC's review of a report provided by Syncplicity indicates that Johnson accessed his Syncplicity.com account on September 23, 2013 – five days after his last day at EMC.

42. On information and belief, Johnson has engaged in a deliberate effort to deceive EMC about his activities during the final hours of his employment with the company, his continued possession of the offending External Storage Devices, and his continued possession of the Misappropriated Materials. On information and belief, Johnson is now using the Misappropriated Materials to benefit his current employer, Pure Storage.

43. Johnson's failure to return and, on information and belief, his use of the Misappropriated Materials after his employment with EMC and while employed by an EMC competitor, constitutes a violation of his KEA.

*Johnson's Unlawful Conduct is Part of a Larger Scheme*

44. Johnson's unlawful conduct is part of a larger campaign by Pure Storage and numerous former EMC employees now employed by Pure Storage, to compete unfairly with EMC by, among other things, misappropriating EMC's Confidential Information and Property, unlawfully soliciting EMC's customers and raiding EMC of its valuable employees, all in an effort to increase Pure Storage's presence in the marketplace at the expense of EMC. Since last year, not fewer than 30 high-performing employees have departed EMC under suspicious circumstances to join Pure Storage. EMC has been forced to initiate litigation seeking declaratory relief and preliminary and permanent injunctive relief to enjoin its former employees from continuing to possess EMC Property, from using or disseminating EMC Property, and from unlawfully soliciting EMC employees and customers – all in violation of their KEAs with EMC. *See EMC Corporation v. Cruey et al.*, Suffolk Superior Court, Civil Action No. 13-0843-C (granting preliminary injunction); *EMC Corporation v. Tanner*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-11386-WGY (voluntarily dismissed pursuant to settlement agreement); *EMC Corporation v. Cochran*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-12380-PBS (Court-ordered return of EMC materials; injunction motion and evidentiary hearing pending).

45. Johnson's possession of EMC materials during his employment with a commercial rival is among the precise conduct that the KEA is intended to prevent in order to protect EMC's legitimate business interests, including its Confidential Information and Property and the goodwill it has earned in the enterprise storage marketplace.

### FIRST CAUSE OF ACTION

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 for Breach of the KEA)**

46. The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

47. As described above, and further set forth below, Johnson breached his KEA.

48. As a result of Johnson's breaches and unlawful conduct, EMC has suffered and will continue to suffer irreparable harm.

49. An actual, substantial, justiciable, and continuing controversy exists between EMC and Johnson concerning his breaches and unlawful conduct.

50. Accordingly, EMC seeks a judgment pursuant to 28 U.S.C. § 2201 that Johnson has breached one or more provisions of his KEA.

51. The KEA is a valid and binding written agreement between EMC and Johnson.

52. Johnson's KEA was made for valid consideration.

53. EMC performed its contractual duties under Johnson's KEA.

54. Johnson's KEA is reasonable, consonant with public policy, and is necessary to protect legitimate business interests, including EMC's Confidential Information and Property and goodwill in the enterprise storage market.

55. As a result of the conduct described above, Johnson breached his KEA by failing to return, and, on information and belief, continuing to use on behalf of Pure Storage, the Misappropriated Materials.

56. EMC has suffered and will continue to suffer irreparable harm as a result of Johnson's conduct.

## SECOND CAUSE OF ACTION

**(Injunctive Relief)**

57. The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

58. EMC has a reasonable likelihood of succeeding on the merits of its claim for declaratory relief based on standard principles of contract interpretation, and the facts already

developed and sworn to in this Verified Complaint and the Declaration of Kevin Brisson, filed herewith.

59. If Johnson continues to possess and/or use EMC Property, EMC will suffer irreparable injury. By contrast, if Johnson is enjoined from violating his KEA while this Court determines the rights of the parties, Johnson will suffer no such injury.

60. This Court should enjoin Johnson from possessing or using EMC Property (including the Misappropriated Materials) during the pendency of this action.

### Prayers For Relief

WHEREFORE, Plaintiff EMC Corporation respectfully requests that this Court:

(i) Issue an order of notice for a hearing on EMC's request for a preliminary injunction under prayer (ii) below:

(ii) After a hearing, preliminarily (1) require Johnson to identify to EMC and preserve all EMC Property in his possession, custody, and control; return to EMC the Misappropriated Materials (as defined in the Verified Complaint); identify the physical and/or electronic locations where all EMC Property currently resides; and enjoin Johnson from further use or disclosure of EMC Property; and (2) authorize EMC to take steps necessary to access the content of Johnson's Syncplicity account and terminate Johnson's access to his Syncplicity account.

(iii) After further proceedings, enter judgment declaring that Johnson has violated his KEA with EMC and permanently enjoining him further violations during the complete contractual term of the KEA; and

(iv) Enter such other or further equitable relief as it deems just and proper.

        Respectfully Submitted,

        CHOATE HALL & STEWART LLP

        */s/ Paul D. Popeo*
        Paul D. Popeo (BBO No. 567727)
        G. Mark Edgarton (BBO No. 657593)
        Kevin C. Quigley (BBO No. 685015 )
        Two International Place
        Boston, Massachusetts  02110
        Tele: (617) 248-5000
        Fax: (617) 248-4000
        ppopeo@choate.com
        medgarton@choate.com
        kquigley@choate.com

Dated:  October 18, 2013        *Counsel for Plaintiff EMC Corporation*

*Of Counsel*

Paul T. Dacier (BBO No. 616761)
Patricia J. Hill (BBO No. 554834)
EMC Corporation
176 South Street
Hopkinton, MA 01748
Tele: (508) 435-1000