# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
EMC CORPORATION.                          )
                                          )
              Plaintiff,                  )
                                          )
v.                                        )        Civil Action No. _____
                                          )
CHADWICK JOHNSON                          )
                                          )
                                          )
              Defendant.                  )
_____)


## PLAINTIFF EMC CORPORATION'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Paul D. Popeo (BBO No. 567727)            *Of Counsel:*
G. Mark Edgarton (BBO No. 657593)
Kevin C. Quigley (BBO No. 685015)         Paul T. Dacier (BBO No. 616761)
CHOATE HALL & STEWART LLP                 Patricia J. Hill (BBO No. 554834)
Two International Place                    EMC Corporation
Boston, MA  02110                         176 South Street
Tele: (617) 248-5000                      Hopkinton, MA 01748
Fax: (617) 248-4000                       Tele: (508) 435-1000
ppopeo@choate.com
medgarton@choate.com
kquigley@choate.com

October 18, 2013

## PRELIMINARY STATEMENT

This case involves the violation of a Key Employee Agreement ("KEA") by a former sales representative of plaintiff, EMC Corporation ("EMC"), a leading technology company that, among other things, designs and sells computer data storage systems designed for large-scale, high-technology environments. EMC recently learned that defendant, Chadwick Johnson ("Johnson"), breached the KEA that he executed with EMC by failing to return highly confidential, competitively sensitive EMC Property and, on information and belief, by using EMC Property on behalf of his new employer, Pure Storage, Inc. ("Pure Storage"). Pure Storage is a direct competitor to EMC in the enterprise storage market.

Pursuant to his KEA, Johnson has ongoing contractual obligations to EMC, including (a) not to use, divulge or disclose to persons outside of EMC its confidential and proprietary business information not available to the public concerning EMC and its customers ("Confidential Information"), and (b) to return all Company materials as described in the KEA, (collectively with Confidential Information, "EMC Property") in his possession, custody or control upon leaving EMC.

During his tenure as an EMC sales representative, Johnson was entrusted with competitively sensitive, confidential business information developed and used by EMC. This confidential EMC information is critical to the enterprise storage sales process. Indeed, it is what EMC explicitly sought to protect by requiring its sales representatives, including Johnson, to execute KEAs. EMC now seeks a narrowly-tailored preliminary injunction compelling Johnson to adhere to his obligations by returning EMC Property wrongfully in his possession. EMC does not seek to prohibit Johnson from working for Pure Storage. Nor does EMC seek to prohibit Pure Storage from competing with EMC. It merely seeks an order requiring Johnson to

comply with the return of EMC Property obligation to which he previously agreed by executing his KEA.

As demonstrated below, EMC is likely to succeed on the merits of its claim that Johnson breached his KEA by failing to return EMC Property.  The injunctive relief sought by EMC is specifically designed and necessary to prevent further irreparable harm by protecting EMC's legitimate business interests in safeguarding its proprietary and confidential information. Moreover, because the injunction merely requires Johnson to abide by the terms of his KEA, the balance of the harms tips sharply in EMC's favor.   Finally, enforcement of contractual obligations and protection of confidential information is sound public policy.  The Motion should be granted and Johnson should be enjoined as requested herein.

## FACTUAL BACKGROUND[1]

### *The Business of EMC*

EMC is engaged in, among other things, the business of designing, manufacturing and selling technologies and information storage systems for managing information in complex technical environments.  Verified Complaint ("Ver. Compl.") ¶ 11.  EMC competes with many companies in the markets that it serves, and its products and services have achieved broad market acceptance due in large part to their technical superiority to competing offerings and the team of skilled sales professionals and consultants at EMC who effectively market and sell these products to EMC's customers.  *Id.* ¶ 12.

One of the significant markets in which EMC competes is the enterprise storage market. Enterprise storage refers to the market for computer data storage designed for large-scale high-technology environments.  *Id.* ¶ 13.  EMC and Pure Storage – Johnson's current employer – are

---

[1] The relevant factual background is set forth in detail in EMC's Verified Complaint, filed contemporaneously herewith.

commercial rivals and compete directly in the enterprise storage market.  *Id*.

EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its trade secrets and Confidential Information, including but not limited to, requiring its employees to sign KEAs, requiring its customers, partners and vendors to sign non-disclosure agreements, password protecting its computer systems and employing physical security measures at all of its facilities.  *Id.* ¶ 14.  Moreover, EMC adopts and enforces several written policies that are designed to protect its Confidential Information and trade secrets, including following the concept of "need-to-know" or "least privilege," pursuant to which employees are only provided the minimum access to Confidential Information needed to perform their assigned duties.  *Id.*

### *Johnson's Employment and Key Employee Agreement with EMC*

Johnson was a highly-compensated and valued EMC employee, responsible for selling EMC's suite of products to key strategic enterprise accounts.  Johnson was employed by EMC (or its subsidiary VMware) as a Partner Sales Manager from February 13, 2006 until September 18, 2013.  In his final four years at EMC alone, EMC paid Johnson more than $1.1 million.  *Id.* ¶ 15.

As a Partner Sales Manager, Johnson was responsible for several key EMC accounts, and was entrusted with competitively sensitive business information developed and used by EMC, including confidential business plans, customer and partner lists, marketing strategies, product development plans, product offerings, pricing structures, solicitation methods, sales strategies and other confidential and proprietary information that would be valuable to an EMC competitor such as Pure Storage.  *Id.* ¶ 16.  Johnson also acquired confidential information regarding ongoing and potential customer relationships and the key decision makers within those organizations, such as Chief Information Officers, Directors of Infrastructure and Purchasing

3

Managers.  *Id.*

To protect EMC's body of patentable, trade secret, and confidential information, EMC requires employees such as Johnson to enter into KEAs at the commencement of their employment with EMC.  *See* Exhibit A (Johnson KEA).  Johnson entered into the KEA explicitly "[i]n view of the highly competitive nature of the business of [EMC], the need of [EMC] to maintain its competitive position through the protection of its goodwill, trade secrets and confidential and proprietary information, and in consideration for being provided with access to certain trade secrets and/or confidential and proprietary information in conjunction with [Johnson's] employment with [EMC]."  Exhibit A, p. 2.

By executing his KEA with EMC, Johnson agreed, among other things, not to use, divulge or disclose to persons outside of EMC any Confidential Information, and to keep all non-public EMC materials and information confidential:

> **Confidentiality of Company Materials**.  You agree that both during your employment with [EMC] and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within [EMC] whose positions require them to know it, any information not already lawfully available to the public concerning [EMC] ("Confidential Information").  Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business or products of [EMC]; any information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposals and the responses thereto.

Exhibit A, ¶ 3.

Through his KEA, Johnson also expressly acknowledged that information about EMC's customers, partners and vendors was confidential, and he agreed not to use or disclose it:

> **Customer, Partner, and Vendor Confidentiality**.  You recognize that it is essential to [EMC's] success that all nonpublic customer, partner and vendor information is deemed to be confidential and be properly treated as a confidential trade secret.  Therefore, you agree not to use or disclose any such customer, partner or vendor information except as may be necessary in the normal conduct of [EMC's] business for the specific customer, partner or vendor, and at the end of your employment with [EMC], you will return to [EMC] any materials containing such information.

*Id.* ¶ 2.

Johnson further agreed that, upon termination from EMC, he would return to EMC all

EMC Property:

> **Return of Company Materials**.  At the time of your termination, for any reason, from [EMC], you agree to return immediately to [EMC] all [EMC] materials, which include but are not limited to all documents in any tangible or electronic form and all property, in your possession, custody or control relating to work done for [EMC] or relating to the processes and materials of [EMC], as well as all materials concerning past, present and future or potential EMC clients, customers, products and/or services.  Such materials include, but are not limited to, customer and/or vendor lists, customer and/or vendor prospect material, financial projections, pricing or other sales-related data, rate structures, all technical materials, presentation materials, and software owned or developed by [EMC] for any purpose in any form.  You also agree to return to [EMC] all materials provided by customers of [EMC] and all teaching materials provided by [EMC].

*Id.* ¶ 6.

Johnson agreed that any breach of his KEA, including a violation of the customer non-solicitation and return of EMC Property clauses, would cause "immediate and irreparable harm to [EMC] not compensable by monetary damages," and that EMC would "be entitled to obtain injunctive relief, in addition to all other relief . . . to enforce the terms of th[e KEA]."  *Id.* ¶ 7(d). Johnson also expressly agreed to "consent to personal jurisdiction in [the state and/or federal courts located in Massachusetts]."  *Id.* ¶ 7(h).[2]

---

[2] The KEA put Johnson on notice that (a) EMC could commence an action against him in court seeking injunctive and declaratory relief for violation of the KEA, (b) the appropriate venue for such action is "in the state and/or federal courts located in Massachusetts," and (c) the KEA "shall be governed by and construed in accordance with

*Johnson Failed to Return, and is Using, EMC Property in Violation of his KEA*

Johnson's last day at EMC's Austin, Texas office was September 18, 2013. Ver. Compl.

¶ 30. Through forensic analysis of Johnson's EMC-issued laptop ("Laptop"), EMC has learned

recently that on 17th, and 18th, 2013 – during the final 48 hours of his EMC employment –

Johnson surreptitiously accessed several EMC files on his Laptop from two separate external

storage devices ("External Storage Devices") that he failed to return upon his termination from

EMC. *Id.*

Among the files Johnson accessed on his EMC Laptop from the External Storage Devices

on September 17 and 18, 2013 were:

- *Registration Report on 09.xlsx*: This EMC Registration Report contains in excess of 93,000 entries.  The Registration Report contains information that EMC salespersons are required to document in the EMC system when they work with a new customer or new EMC partner.  The Registration Report includes names, purchase histories, deal values, and other highly specific, confidential, and critical information about EMC customers. This document is labeled "EMC CONFIDENTIAL."

- *PurevsXtremIObattlecard_9_9_2013(3).pdf*:  This  EMC  Competitive Selling Guide sets forth EMC's strategy for selling its XtremIO flash storage product against Pure Storage's FA Series products.  The Selling Guide includes information regarding the competitive advantages of EMC's XtremIO product, as well as highly sensitive, detailed explanations of EMC's head-to-head selling strategy.  This document is labeled "EMC CONFIDENTIAL."

- *Chad Johnson 2H 2013 Business Plan_template.pptx*: This EMC Business Plan contains detailed data regarding EMC customer, partner, and employee relationships, as well as highly sensitive analysis of the competitive landscape and EMC's "Key Strategies" for growth in the enterprise storage market.  This document is labeled "EMC CONFIDENTIAL."

---

the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law."  *Id.*, ¶¶ 7(d), (h), and 7(j).

- *Fazende Q3 Channel Leverage Framework Review.pptx*. This document includes extensive data and analysis regarding EMC's strategy for leveraging customer and partner relationships. This document is labeled "EMC CONFIDENTIAL."

*Id.* ¶ 31.

In addition, on September 17, 2013, Johnson printed a file named *Fazende Q3-13 revenue Position 091713.xlsx*. This file is an Area Manager Report that includes detailed confidential and sensitive information regarding EMC customers, specific products sold to those customers, revenue generated, progress against goals, sales forecasts, and responsible sales representatives. This document, too, is EMC Confidential Information. Johnson did not return this document upon his termination from EMC. *Id.* ¶ 32.

The above-described materials (collectively, the "Misappropriated Materials") constitute EMC Property and Confidential Information, and they are expressly subject to the restrictions set forth in Johnson's KEA. Ex. A, ¶ 2 (customer, partner, and vendor information is confidential); ¶ 3 (Confidential Information includes "any information concerning the particular needs of clients or customers and their buying patterns"); ¶ 6 ("all materials concerning past, present and future or potential EMC clients, customers, products and/or services" must be returned upon termination of employment). As explained above, Johnson agreed that (a) he would "not use for [his] own benefit, divulge or disclose to anyone except to persons within [EMC] whose positions require them to know it" the Misappropriated Materials, and (b) he would return the Misappropriated Materials upon termination of his employment. Ex. A, ¶¶ 3 and 6.

The information contained in the Misappropriated Materials is confidential, competitively sensitive, and owned by EMC. It has independent economic value by virtue of not being known to EMC's competitors, including Pure Storage, who could obtain substantial economic value from its disclosure or use, including by using the information to unfairly compete with EMC and

7

poach EMC's customers.  Ver. Compl. ¶ 34.  As explained above, EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of this and other Confidential Information. Johnson accessed the Misappropriated Files on his final two days at EMC, when he had no legitimate business reason for accessing the particular, highly confidential Misappropriated Files.  *Id.*  Moreover, each of the Misappropriated Files resided on the two separate External Storage Devices as of the date that Johnson accessed them on his Laptop.  *Id.* Because Johnson did not return these External Storage Devices upon his termination from EMC, EMC cannot identify the additional EMC files (and the amount thereof) that may reside on those devices.  *Id.*

EMC confirmed that Johnson did not return the External Storage Devices containing the Misappropriated Materials to the same EMC employee to whom he returned his Laptop.  *Id.* ¶ 35.  EMC also conducted a search of Johnson's former office space at EMC but did not locate the External Storage Devices.  *Id.*

On September 23, 2013, a member of the EMC Office of the General Counsel wrote to Mr. Johnson reminding him of his continuing legal obligations to EMC, including his obligation to maintain EMC's Confidential Information and to return to EMC all EMC documents, information and materials (the "Legal Letter").  *Id.* ¶ 36.

By letter dated October 8, 2013, Johnson responded to the Legal Letter by returning to EMC substantial volumes of material that Johnson had misappropriated and taken with him upon joining Pure Storage.  *Id.* ¶ 37.  Such material included eight separate external storage devices containing EMC materials, contact business cards, a wireless hotspot and a wireless receiver. Johnson claimed in the letter that he was returning "all company materials, information and documents" in his possession.  *Id.*

Mr. Johnson did not reference the two External Storage Devices which EMC's forensic analysis confirms he connected to his EMC-issued laptop in the final 48 hours of his employment with the company, and he did not reference the highly sensitive EMC files that he accessed through that process.  *Id.* ¶ 38.

Mr. Johnson did not return to EMC the two External Storage Devices that EMC's forensic analysis confirms he connected to his EMC-issued laptop in the 48 final hours of his employment with the company – notwithstanding his return of other EMC Property unlawfully in his possession.  *Id.* ¶ 39.

In addition to the above, on February 8, 2013, while still employed by EMC, Johnson created a "Free Subscription" account using his EMC email account at Syncplicity.com, which is an internet-based service to store, synchronize, and share files among computers and mobile devices.  *Id.* ¶ 40.  Johnson configured this service to synchronize numerous folders containing hundreds of files between his EMC-owned laptop and Syncplicity's servers, including EMC confidential information.  *Id.*

Johnson's October 8, 2013, letter states that he "deleted [his] EMC Syncplicity backup account upon [his] departure," but EMC's review of a report provided by Syncplicity indicates that Johnson accessed his Syncplicity.com account on September 23, 2013 – five days after his last day at EMC.  *Id.* ¶ 41.

On information and belief, Johnson has engaged in a deliberate effort to deceive EMC about his activities during the final hours of his employment with the company, his continued possession of the offending External Storage Devices, and his continued possession of the Misappropriated Materials.  *Id.* ¶ 42.  On information and belief, Johnson is now using the Misappropriated Materials to benefit his current employer, Pure Storage.  *Id.*  This use, along

with his failure to return the Misappropriated Materials to EMC, constitutes a violation of his KEA.

### Johnson's Unlawful Conduct is Part of a Larger Scheme

Johnson's unlawful conduct is part of a larger campaign by Pure Storage and numerous former EMC employees now employed by Pure Storage, to compete unfairly with EMC by, among other things, misappropriating EMC's Confidential Information and Property, unlawfully soliciting EMC's customers and raiding EMC of its valuable employees, all in an effort to increase Pure Storage's presence in the marketplace at the expense of EMC. *Id.* ¶ 44. Since last year, not fewer than 30 high-performing employees have departed EMC under suspicious circumstances to join Pure Storage. *Id.* EMC has been forced to initiate litigation seeking declaratory relief and preliminary and permanent injunctive relief to enjoin its former employees from continuing to possess EMC Property, from using or disseminating EMC Property, and from unlawfully soliciting EMC employees and customers – all in violation of their KEAs with EMC. *See EMC Corporation v. Cruey et al.*, Suffolk Superior Court, Civil Action No. 13-0843-C (granting preliminary injunction); *EMC Corporation v. Tanner*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-11386-WGY (voluntarily dismissed pursuant to settlement agreement); *EMC Corporation v. Cochran*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-12380-PBS (Court-ordered return of EMC materials; injunction motion and evidentiary hearing pending).

Johnson's possession of EMC materials during his employment with a commercial rival is among the precise conduct that the KEA is intended to prevent in order to protect EMC's legitimate business interests, including its Confidential Information and Property and the goodwill it has earned in the enterprise storage marketplace. EMC seeks a narrowly-tailored

preliminary injunction to prevent Johnson's further unlawful possession and/or use of EMC Property.   EMC's proposed injunction will protect EMC's legitimate interests and impose no harm on Johnson.  This Motion should be granted.

## ARGUMENT

### I.      THE RELEVANT STANDARD.

The standard for granting a preliminary injunction in the First Circuit is well-established. The Court should grant a preliminary injunction where the plaintiff shows that:  (a) it has a reasonable likelihood of succeeding on the merits of its claim; (b) it will suffer irreparable injury if the injunctive relief is not granted; (c) the injury that it will suffer in the absence of an injunction outweighs the injury to the defendant that will result from the injunction; and (d) the injunction would not harm the public interest.  *E.g., Swarovski Aktiengesllschaft v. Building No. 19, Inc.*, 704 F.3d 44, 48 (1st Cir. 2013).  EMC satisfies each of these requirements.

### II.     THIS COURT SHOULD ENJOIN JOHNSON FROM CONTINUING TO POSSESS AND/OR USE EMC PROPERTY.

#### A.      EMC Is Likely to Succeed on the Merits of its Claim.

In exchange for EMC's agreement to provide generous compensation to Johnson, he voluntarily signed a KEA with EMC that contains provisions designed to protect EMC's Property, proprietary information, and competitive position in the marketplace.   Ver. Am. Compl. ¶ 22-24; Exhibit A.  The KEA was entered into as a condition of, and in consideration for, his employment with EMC and his access to EMC's Confidential Information.  Exhibit A.

The KEA constitutes a valid and enforceable contract between EMC and Johnson. Similar provisions in employment agreements have long been recognized as valid and enforceable under Massachusetts law.   *See Cedric G. Chase Photographic Labs., Inc. v. Hennessey*, 327 Mass. 137, 140 (1951) (enjoining defendant from using knowledge of plaintiff's

business for benefit of a competitor where the defendant's employment contract prevented disclosure of information concerning plaintiff's customers); *Life Image, Inc. v. Brown*, 29 Mass. L. Rep. 427, 2011 Mass. Super. LEXIS 338 (Mass. Super. Ct. Dec. 22, 2011) (granting preliminarily injunction to prevent former employee from violating non-disclosure and non-competition agreements).

The non-disclosure and return of EMC Property provisions in Johnson's KEA serve to protect EMC's legitimate business interests in the secrecy of its confidential information. Information and analysis regarding EMC customer relationships, sales and pricing data, product specifications, and competitive strategy – like that contained in Johnson's Misappropriated Materials – is highly sensitive, critically important, and confidential to EMC.  The character and value of such information, along with EMC's diligent efforts to protect its  secrecy, qualify it as protected confidential information under long-standing Massachusetts precedent.  *See Jet Spray Cooler v. Crampton*, 361 Mass. 835, 939-42 (1972); *EMC Corp. v. Breen*, 2013 Mass. Super. LEXIS 39, at *16 (Mass. Super. Ct. Feb. 21, 2013) (finding sufficient showing that materials concerning EMC's products, sales, and strategies were "confidential to EMC" under the *Jet Spray Cooler* framework).

Indeed, the Supreme Judicial Court has repeatedly recognized that injunctive relief is the appropriate remedy to stop unlawful conduct like Johnson's in this case.  *Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc.*, 381 Mass. 1 (1980) (affirming the imposition of an injunction restraining defendant's use of plaintiff's trade secrets); *Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643 (1976) (enjoining former employees who used documents for their own benefit in violation of their contractual obligation to return company property upon termination of employment).  Massachusetts courts have regularly granted injunctive relief in cases similar to

12

this one.  *See, e.g.*, *EMC Corp. v. Allen*, 8 Mass. L. Rep. 21, 1997 Mass. Super. LEXIS 102, at *15 (Mass. Super. Ct. Nov. 20, 1997) (temporarily enjoining former EMC employee from "using or disclosing any EMC information . . . which EMC treats as confidential and/or proprietary").

As detailed in the Verified Complaint, Johnson breached one or more terms of his KEA, including by failing to return EMC Property – the Misappropriated Materials – to EMC, and, on information and belief, by using this information on behalf of Pure Storage.  Ver. Am. Compl. ¶¶ 42-46.  EMC has been, and will be, damaged by Johnson's unlawful conduct because Johnson and Pure Storage can use EMC Property to unfairly compete with EMC.  In sum, Johnson's breach of his KEA is unambiguous, and EMC is likely to succeed on the merits of this claim.

**B.**      **EMC Will Be Irreparably Harmed if Johnson is Not Enjoined From Continuing to Possess and/or Use EMC Confidential Information.**

EMC will suffer irreparable injury if Johnson is not enjoined from further possession and use of EMC's Confidential Information and Property, including the Misappropriated Materials. Massachusetts courts have acknowledged that "[a]s a general rule, a breach of [post-employment restriction] tied to trade secrets concerns triggers a finding of irreparable harm."  *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 130 (D. Mass. 2011); *see also Harlan Labs., Inc. v. Campbell*, 900 F. Supp. 2d 99, 109 (D. Mass. 2012) (a successful showing of likelihood of success on the merits, combined with "evidence of confidential information in [defendant's] possession at the start of his time with" a competitor is sufficient to demonstrate irreparable harm).  When a former employee, possessing the confidential information of his former employer, is at risk of using the confidential information, he "threatens [his] former employer's market in a fashion that cannot be monetized."  *Life Image, Inc. v. Brown*, No. 2011-03764, 2011 Mass. Super. LEXIS 338, at *22 (Mass. Super. Ct. Dec. 22, 2011) (irreparable harm where plaintiff "is in the position of a coach, one of whose players has left, *playbook in hand*, to join

the opposing team *before* the big game"); s*ee also Boulanger v. Dunkin' Donuts*, 442 Mass. 635, 643 n.12 (""[W]orking for a competitor of the [plaintiff] makes it likely that the information the [defendant] possesses will  be used, yet it might be impossible to detect or prove."); *Investors Bank & Trust Co. v. Gunes*, No. 94-2567F, 1994 Mass. Super LEXIS 245, at *2 (Mass. Super. Ct. June 2, 1994) (irreparable injury exists where there is an "immediate threat" that a defendant will use the plaintiff's business information "for the benefit of [a competitor] and to the detriment of the plaintiff").

Courts "typically" find irreparable harm where the agreement at issue is "designed at least in part to protect trade secrets." *Avaya, Inc. v. Ali*, No. 12-10660, 2012 U.S. Dist. LEXIS 97240, at *26 (D. Mass. July 13, 2012).  This is so because "if confidential information is allowed to be revealed, the damage will have already occurred" and "there is no way to assess the amount of loss that the plaintiff will sustain due to the dissemination of highly confidential material." *Id.* (citing *New Eng. Circuit Sale v. Randall*, No. 96-cv-10840, 1996 U.S. Dist. LEXIS 9748 (D. Mass. June 4, 1996)).

Here, EMC is faced with the immediate threat that Johnson has used and will continue to use EMC's Property for his own – or Pure Storage's – benefit.  The information he unlawfully retained and, on information and belief, has since accessed (in violation of his KEA) provides Johnson and Pure Storage with a ready means to unfairly build and grow their competing business more quickly and easily than they lawfully could do.

Moreover, in paragraph 7(d) of the KEA, Johnson explicitly acknowledged that "any breach of th[e KEA] will cause immediate and irreparable harm to [EMC] not compensable by monetary damages." Exhibit A.  This explicit contract language "not only obviates the need for the ordinary irreparable damage analysis, it adds contractually binding provisions that this Court

14

is not at liberty to change or ignore." *A.R.S. Servs.*, 2013 Mass. Super. LEXIS 52, at \*45 n.7

(Mass. Super. Ct. Apr. 5, 2013) (quoting *Belkin v. Levenson*, 19 Mass. L. Rep. 621, 2005 Mass.

Super. LEXIS 366, at \*10 (Mass. Super. Ct. Aug. 9, 2005)).   Johnson should not be surprised

that EMC is seeking the precise injunctive relief called for in the KEA.   Only an injunction

designed to prohibit Johnson from continuing to possess and use EMC Property can prevent the

irreparable harm that will result to EMC in the absence of an injunction.

## C.      EMC's Injury Outweighs Any Hypothetical Harm to Johnson.

The balance of harms heavily favors EMC because EMC's motion for a preliminary

injunction is limited and narrowly-tailored.   EMC requests only that the Court (1) require

Johnson to return to EMC the Misappropriated Materials and (2) enjoin Johnson from the further

use or disclosure of any EMC Property and Confidential Information.   Without such relief,

Johnson could continue to use or disclose the Misappropriated Materials while this litigation

proceeds.   Moreover, if such property is destroyed or altered, EMC will be harmed because it

will have no ability to investigate the full extent of the theft and subsequent use of its sensitive

business information.   As set forth above, the hardship imposed on EMC would be substantial

because EMC's competitive position in the marketplace could be severely and irreparably

damaged.

Conversely, the requested relief imposes no hardship on Johnson.   EMC asks only that

Johnson comply with the terms of the KEA he freely entered into as a condition of employment.

Abiding with contractual obligations is not a hardship.

## D.      Injunctive Relief is Consonant With the Public Interest.

Theft of confidential information hurts the public interest; prevention of such theft

protects the public interest.   *See, e.g., Avaya, Inc.*, 2012 U.S. Dist. LEXIS at \*29 ("Given the

public's interest in protecting trade secrets and customer goodwill and ensuring that legally enforceable contracts are in fact enforced, the Court finds no friction between the public interest and the issuance of a preliminary injunction in this case.").  This relief should be granted.

## CONCLUSION

For the foregoing reasons, and based on the facts set forth in EMC's Verified Complaint and the Declaration of Kevin Brisson filed therewith, the proposed Order attached to EMC's Motion for Preliminary Injunction should be entered.

Respectfully submitted,

CHOATE HALL & STEWART LLP

/s/ *Paul D. Popeo*
Paul D. Popeo (BBO No. 567727)
G. Mark Edgarton (BBO No. 657593)
Kevin C. Quigley (BBO No. 685015)
Two International Place
Boston, Massachusetts  02110
Tel: (617) 248-5000
Fax: (617) 248-4000
ppopeo@choate.com
medgarton@choate.com
kquigley@choate.com

Dated:  October 18, 2013

*Counsel for Plaintiff EMC Corporation*

*Of Counsel*

Paul T. Dacier (BBO No. 616761)
Patricia J. Hill (BBO No. 554834)
EMC Corporation
176 South Street
Hopkinton, MA 01748
Tele: (508) 435-1000

16

## CERTIFICATE OF SERVICE

I hereby certify that, on October 18, 2013, this document filed through the ECF system will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent via overnight mail to any non-registered participants.


/s/ Kevin C. Quigley
Kevin C. Quigley

17